By the Court.—Sanford, J.
I am of opinion that the learned chief justice should have directed a verdict for defendants as requested at the close of the evidence, and that a motion for a new trial on the minutes should have been granted, for the reason that there was no proof of any payment to the defendants on or before May 13, 1871, of the premium which accrued and was payable on that day, and no sufficient proof of any facts which, in judgment of law, can be deemed equivalent to such payment, so as to entitle the assured to another paid-up policy for an amount bearing the same proportion to the original amount assured as the number of complete years for which premiums were paid bears to the total number of years comprised in the whole term of the policy. It is not claimed or pretended that there was any actual payment of the premium for 1872, or any evidence of such payment. Indeed, the learned chief justice so assumed and charged. In response to a request by defendant’s counsel, that the court should charge that “ if the premium for 1871 was not paid, the plaintiff can not recover, even for the proportionate paid-up policy, unless some waiver of that payment can be shown,” the court stated that this proposition was equivalent to what he had already charged, and added: “I have said to the jury that it must be what in judgment of law would amount to a payment between these parties, not an actual payment,/»)’ there is no evidence of actual payment.” We have there *6 fore only to consider whether there was sufficient evidence in the case to show that ‘ the company did charge this amount to the agent, and if so, whether this fact, if uncontradicted, can be regarded as giving credit to the assured, and thus constituting in judgment of law a payment of the premium.” The only testimony on this subject is that of the plaintiff’s attorney, Mr. Stilwell, who testified to two interviews had by him with Mr. Alexander, the defendants’ president. When the policy was handed to him by the plaintiff for collection, he called at the office of the company, and saw the president, Mr. Alexander, and asked him what the difficulty was. Mr. Alexander went with him to the enclosure where the book-keepers were in the office; he called some gentlemen there; they looked over the book, and Mr. Alexander then said that the last premium on this policy (that of May 13, 1872) had not been paid, and that it was canceled. Witness asked if there were not dividends upon it sufficient to keep it alive the ten days the last premium was overdue, the premium being due on May 13, and he having died on May 20. Mr. Alexander re plied that the premiums were payable yearly in advance, and the premium not having been paid when it was due, the policy was canceled, and of course they were not entitled to any dividends on it. Witness stated to Mr. Alexander that by the terms of the policy the plaintiff was entitled in any event to seven hundred and fifty dollars ; that even if this last payment were not made, she was entitled to a paid-up policy for three-twentieths of the amount. Mr. Alexander said she would have teen entitled to that if she had surrendered the policy within the three months; but the three months had expired, and therefore she had no rights.
Thus far the conversation had no reference to the premium which fell due on May 13, 1871, and the defendants’ president had merely expressed an opinion *7 as to the rights of the parties, founded upon the assumption that only the premium which accrued on May 13, 1872, remained in arrear. The payment or non-payment of any prior premium was not under discussion, and no reference to such premium was made. Mr. S til well controverted the correctness of Mr. Alexander’s opinion, and was thereupon referred by him to the counsel for the company, Mr. Lord. After considerable discussion with the witness during a period of two or three weeks thereafter, Mr. Lord, or Mr. Day, his partner, as counsel for the company, informed the witness that he had advised the company to settle for seven hundred and fifty dollars, and that they would pay that amount. The next day, witness, who had in the meantime obtained the consent of his .client to accept that amount, called on Mr. Lord, expecting to get the seven hundred and fifty dollars, but was then informed by Mr. Lord or Mr. Day that “they had come across a new difficulty; that the premium for 1871, the year previous, had not been paid.” At the request of witness, the plaintiff then made search for a receipt for that premium, but she could find no receipt for it. She brought, however, to the witness a card, which he subsequently presented to Mr. Lord or Mr. Day, saying: “ Here is a notice to pay the last premium.” Further discussion ensued, and witness was finally told that they would not pay anything. He then went back to the company, saw Mr. Alexander, and asked him why they would not pay this seven hundred and fifty dollars. Mr. Alexander again went back to the enclosure, where the book-keepers were, looked over some books, and said, “It is one of Mr. Phipps’ policies, and this premium for 1871 had been charged up to Mr. Phipps, and so marked paid, and on the settlement of the accounts between Mr. Phipps and the company, or for some other reason, it had been marked off, and for that reason the policy is void, and *8 we will not pay it.” Witness added : “ I believe that was all in regard to it; all that I remember; he went back to the book-keeper, who looked over the books, had a talk with the person who had the books, and. referred to the account, and said that the account had been marked paid in 1871, and that was the reason he told me before that the premium had not been paid.” Upon cross-examination, the witness testified as follows:
Q. “When you had this later interview with Mr. Alexander, the president, after your last interview with Mr. Day, in which Mr. Day told you that they would not settle, and that they had discovered that the premium for 1871 was not paid, are you sure that Mr. Alexander told you that the premium for 1871 had been charged to Mr. Phipps 8 ”
A. “I do not say it had been charged to Mr. Phipps. I am sure he told me the account had been marked paid upon the books, and by way of explanation stated this I speak of.”
Q. “ State it again 8 ”
A. “ He went back to this enclosxire where the books were, and called one of the book-keepers, or somebody who brought down the book there, and he and Mr. Alexander looked over the books together, and then he came to me, and said, 61 asked in regard to that; ’ I said, ‘ Yoxx told me the other day that the trouble was in regard to the last premium.’ 6 Well,’ he said, ‘ that former premium of 1871 had been marked paid upon the books.’ He said that is one of Mr. Phipp’s former policies, and it had been charged up to Mr. Phipps.”
Q. “ Are you sure he said that 8 ”
A. “That is what I gathered from what he said.”
Q. “What were his words, as near as you can recollect 8 ”
A. “That is as near as 1 can recollect—that it had been charged up to Mr. Phipps.”
*9 Q. “Are you sure that you were speaking about the premium of 1871 % ”
A. ‘ ‘ Yes sir. There had been no question about that at all. I claimed that we were entitled to three credits upon the policy, and we had negotiated .upon that, and I had called to settle upon that, and when I finally went back it was to ask how it was that this previous premium was not paid, and he said the premium had been marked paid, whether it was charged up to Mr. Phipps ; those were the particular words. 1 do not know, but that is what I gathered from him.”
I think the fair import of all this testimony, and the only reasonable interpretation of it is, that Mr. Alexander, at the time of his first interview with Mr. Stilwell, was not aware that the premium for 1871 was in arrear, and that therefore he then put his refusal to pay the policy solely on the ground of default in the payment of the premium due on May 13 1872 ; that, at the second interview, while insisting that the policy had, in fact, ceased on May 13, 1871, by reason of a default in the payment of the premium accruing on that day, he endeavored to account for the erroneous impression under which he had labored at the former interview, and to explain his omission then to assign this default as his ground of objection to the plaintiffs claim, by suggesting that he had been misled by entries or marks on the books showing, or tending to show, that the premium due in 1871 had been charged to Mr. Phipps, the agent of the company, and bad accordingly been marked paid ; but that on the settlement of Mr. Phipps’ account it bad been marked off; and that the policy was void. He certainly did not mean to be understood as then admitting that, by reason of such entries or marks, the policy was continued in force or kept alive after May 13, 1871, since he expressly asserted, after concluding *10 his explanation, that by reason of what he had stated, the policy was void.
But assuming that Mr. Alexander did unqualifiedly state that this premium had been charged to Mr. Phipps, the agent, and that such charge was, in point of fact, made on the company’s books, does such a charge when made, so far as appears, without the knowledge of the assured, without the knowledge or consent of Mr. Phipps himself, without any corresponding entry to the credit of the assured, or of Mr. Phipps without proof as to the time when, or the circumstances under which it was made, warrant the inference that in making it the company intended to give, or did give, credit to the assured for its amount as of the date when the premium was payable; discharged the assured from any obligation to pay the premium, if the charge to Phipps was made before the premium became due, or exonerated the assured from the consequences of default, if default had already occurred % The learned judge seems to have so held, for he charged the jury to look well at the evidence and satisfy themselves whether the company did charge this amount to the agent, thus giving credit to the assured, and thus constituting, in judgment of law, a payment of the premium. I can not yield assent to the proposition that the mere fact of a charge or entry in the account of Mr. Phipps, such as Mr. Stilwell testifies Mr. Alexander says was made, would of itself, in judgment of law, constitute a constructive payment of the premium, and operate to exonerate the assured from the consequences of a previous or subsequent actual default.
By the expressed conditions of the policy, “renewal premiums may be paid to an agent, but only on the production of receipts signed by the president, secretary, or actuary, who are alone authorized to sign receipts on the part of the company. No payment *11 made to an agent without such receipt given in return by him is considered valid.” May it not have been the practice of the company—certainly such a practice would have been a safe and proper and convenient precaution—to charge their agents, on entrusting them with such receipts, with the amount of the premium therein specified, thus holding them accountable either for the premium when collected, or if not collected, for the return of the receipt ? And whether such a practice existed or not, would it not have been competent for the company in any individual case, for reasons of its own, to adopt that course ? May it not have been adopted in this particular case ? And if it were adopted, would the charge thus made operate to give credit to the assured, or constitute in judgment of law a payment of the premium % Again, suppose Mr. Phipps, as agent of the company, had seen fit, for reasons of his own, to assume as between the company and himself, and without the knowledge of the assured a liability for the premiums accruing on policies issued through his agency, and on the payment of which he would become entitled to commissions, would the assumption by him of such a liability and the charge to him on the books of the company of a premium about to accrue or already in default, exonerate the policy-holder from all obligation to pay such premium, or would it relieve or discharge him from the forfeiture of the policy consequent upon such default \ If not, as between the company and the assured, such a charge was not1 giving credit to the assured,’ and did not ‘ constitute in judgment of law a payment of the premium.’ I think that, as between the company and the assured, the evidence of Mr. Stilwell was insufficient to show either an actual or constructive payment of the premium which accrued on May 13, 1871, and would not, if uncontradicted, sustain a judgment for the plaintiff. The jury were instructed to render a verdict in favor of *12 the plaintiff for the amount of the contemplated paid-up policy, with interest, if they believed the premium to have been not actually paid, but paid in effect, as between the company and the assured, by charging it over to Mr. Phipps, their agent, so as to make it in effect a payment to the company, as between the company and the assured. And they had just previously been instructed that the charge to Phipps, if made, would be giving credit to the assured, and would constitute in judgment of law a payment of the premium. These instructions seem to^rne to be erroneous.
But if under these instructions it was proper to submit to the jury the question of a constructive payment, in other words, the question whether such a charge was or was not made on the company’s books, or if the language of the learned justice admits of such a construction, as I think it does not, but, on the contrary should be regarded as deciding that question adversely to the defendants, as matter of law, if it was proper to submit to the jury the question whether such charge, if made, operated, as between the assured and the company, as a credit to the asssnred, and as a payment, in effect, though not in fact, the evidence to the contrary, to which the learned chief justice adverted in his charge, seems to me so overwhelmingly preponderant that a new trial ought, in my judgment, to be granted, on the ground that the verdict was clearly against the weight of evidence. On the one hand we have Mr. Stilwell’s somewhat vague and indefinite statement as to Mr. Alexander’s admissions in reference to the contents of defendants’ books, or, rather, as to what he “ gathered” from what Mr. Alexander said in that regard. We have, moreover, the evidence of the plaintiff and her attorney, in reference to the notice of a premium about to accrue, in May, 1872, and assumed to have been received at the office of the assured, shortly before that day. I have little doubt that such *13 a notice was issued by the company, and was received at tlie office of the assured ; the “ticker” for 1872, in which the policy appears to have been entered, through some inadvertence, notwithstanding its forfeiture and cancellation for non-payment of the premium of 1871, and notwithstanding the entry of such forfeiture in the ticker for that year, sufficiently accounts for such a notice, just as it accounts for Mr. Alexander’s misapprehension and admission ; but neither the notice, nor the admission constitutes an estoppel. And this is all the evidence, showing, or tending to show, directly or indirectly, by assertion or inference, any payment of that premium, actual or constructive. On the other hand, we have the testimony of the plaintiff, introduced in support of a theory of this case, which has not yet been adverted to, because it was properly and decisively rejected by the court in his charge to the jury. The theory was, that the omission to pay these premiums when due was excused, by a parol agreement entered into upon the making and delivering of the policy between the plaintiff and Mr. Phipps, the agent.
This agreement constituted, as the complaint avers, a material portion of the consideration which induced the plaintiff to accept the policy. It was to the effect “that premiums thereafter to be paid upon the said policy should be paid at the residence of the plaintiff, in the city of New York, and that the said agent, or some other agent of the defendant, should call for the same at the plaintiff’s residence, with a proper receipt signed by the officers of the defendant, to be delivered to her upon such payment being made.”
In support of the theory of the case which rested on this alleged parol agreement, the plaintiff, called as a witness in her own behalf, testified as follows :
Q. “Did you ever see Mr. Phipps afterwards?”
A. “No sir, not after 1870.”
*14 Q. “ Did any person call upon you for the premium of 1871 ?”
A. “Ho sir.”
Q. ‘ 1 Had you the money to pay for it ? ’ ’
A. “I had the money to pay for it; yes, sir.”
Q. 6 ‘ And if any person had called upon you, you would have paid it % ”
A. “Yes sir, it was ready.”
We have farther the uncontradicted testimony of a Mr. McCorkle, who succeeded Mr. Phipps as agent for the defendants, to the effect that Phipps died about March 1, 1871, fifteen months before the premium for 1871, which is claimed to have been constructively paid by being charged over to him on the company’s books, accrued or become payable. This witness also testified that during the year 1871, and after the premium in question accrued, he repeatedly called on the plaintiff’s husband, whose life was assured in the policy, and to whom, if then living, the policy would be payable, on the expiration of its term of twenty years. That in each of such interviews the subject of reviving the policy by a payment of the premium in arrear, after satisfying the company as to his present condition of health, was considered and discussed. Wright said it was not convenient for him to pay it then, but he would pay it very soon. His attention was particularly called to the fact that he was uninsured, and he said he was aware of the fact, but would very soon have some money and would call down and pay it. Finally, he positively declined to carry on the policy or make another payment thereon. This evidence is wholly uncontradicted. We have, farther, the books of the company containing its accounts, and the testimony of its bookkeepers in regard to the manner in which the accounts were kept. It appears from such testimony and books that it was the practice to charge agents in account *15 with policies and renewal receipts, in accordance with the hypothesis suggested in this opinion, when the legal effect of the alleged charge to Mr. Phipps was under consideration. That, pursuant to such practice, Mr. Phipps’ agency account was charged from time to time with the premiums mentioned in the policies and in the renewal receipts handed him as agent, and with nothing else. That the account exhibits a charge to him of the policy and the first premium due thereon as of May 13, 1869, but no other charge whatever. That, by reason of Mr. Phipps’ death, his account stopped before the premium for 1870 fell-due, and that an entry to that effect was made in the account. Other books of the company were produced and put in evidence to the like effect. The testimony from and in regard to the books was very voluminous, and, as I think, after a careful, protracted, and deliberate examination of it, was conclusive against any assertion of a charge to Phipps of the premium in question, or a credit therefor to the assured, whether by such charge or otherwise. Under these circumstances I think that the verdict does injustice to the defendants ; that it is against the evidence, and ought to be set aside; nor can I doubt that if the learned chief justice before whom the motion for a new trial was informally made, upon his minutes, probably for the mere purpose of an appeal, had been afforded opportunity for a deliberate review of the testimony, upon a case regularly settled and presented, he would have failed to reach the same conclusion.
There is another consideration which, if I entertained any doubt about the propriety of advising the reversal of this judgment and order on the grounds already considered, would have great weight with me in inducing that result. A large mass of matter, confessedly irrelevant, immaterial, and incompetent, was received in evidence in support of the alleged parol agreement that the premiums on the policy should be *16 payable by the plaintiff, at her residence, when called for, and in reference to the action of the plaintiff and of the agent, Mr. Phipps, and to conversations between them, in respect to that mode of payment. It was received under objection, and subject to exception duly taken by defendants’ counsel; and although the complaint was dismissed in so far as the claim to recover the whole amount of-the policy by reason of such parol agreement is concerned, and although the jury were instructed that this evidence must be disregarded by them in determining the questions actually submitted to their consideration, I think it impossible to say that they were not and could not have been strongly influenced and prejudiced thereby.
The evidence tended to show, and for the purposes of the trial, in charging the jury, the learned chief justice expressly assumed that it did show, an agreement between Phipps and the plaintiff to the effect that he would look after the policy, see that the premiums were credited, and that the policy was not forfeited for non-payment of premiums. ■ The jury were, indeed, instructed that this promise was not binding on the company, and that they had no right to regard it as a payment of the premium due on May 13, 1871. It seems to me that this instruction was insufficient to disabuse the minds of the jury of whatever prejudices in favor of the plaintiff her evidence in support of it may have inducéd them to imbibe, and that on this ground, as well as the others already considered, a new trial ought to be had (Erben v. Lorillard, 19 N. Y. 299).
The judgment and order appealed from should be reversed, with costs to abide the event.
Speir, J., concurred.